Katherine Yvonne **TURNER**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 37405.

Court of Criminal Appeals of Texas.

Jan. 20, 1965.

Jack W. Knight, Houston, for appellant.

Frank Briscoe, Dist. Atty., Carl E. F. Dally, Cletus A. Davis and Ruben Hope, Asst. Dist. Attys., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

WOODLEY, Judge.

The offense is child desertion; the punishment, three months in jail.

The complaint and information filed March 27, 1964, alleged that the appellant was the mother of "Infant son whose name is unknown to affiant," and that on or about the 1st day of March, 1964, she "did then and there unlawfully and wilfully desert her said child, the said Infant son whose name is unknown to affiant."

Trial was before the court on a plea of not guilty.

The evidence introduced by the state reveals the following:

On the morning of March 1, 1964, Paula Ann Herrera, an eleven year old school girl, and her younger sisters, Mary Ruth and Aurelia, were walking through an alley on their way to church when they heard a wee voice crying. Looking down, they saw a naked baby lying on a blanket on a pile of leaves or grass. The children ran for help.

Paula Ann returned to the scene with Mattie Jo Chesson and her sister and showed them the baby. Mattie Jo touched the baby and found it was cold and she told her sister to go get their daddy. She did so and he came and took off his shirt and put it on the baby.

Paula reported to her step-father and when he arrived at the scene the police had the baby in an ambulance ready to take it to the hospital.

Ten year old Mary Ruth Herrera testified that she noticed blood on the blanket but "there wasn't any blood on the baby, but he was very dirty" and "the baby was blue."

Mattie Jo Chesson testified that when she arrived and saw the baby "at first it was laying there on this little blanket and was all dirty, and I bent down and felt of his chest to see how cold it was and to see if it was breathing or anything, and he was real cold and he was turning blue around the mouth * * *."

J. W. Dunn, Accident Investigator for the City of Houston, who received an ambulance call, testified that it had been raining two or three days and the alley was muddy; that he was directed to "a little bundle over on a pile of leaves and I ran there and there was a new born baby in the bundle * * *. There was a shirt and blanket over it and a white blanket that had been under it * * * the weather was getting pretty bad, it had not started sprinkling yet, but it looked like it might any minute, and I picked the baby up and put him in the car until the ambulance arrived * * * approximately four or five minutes after I got the baby into the car."

Mary Sue Jordan, employed by Harris County Probation Department, testified that while the baby was in custody and the Probation Department was attempting to find out who the mother was, she went to the neighborhood where the baby was found; talked to numerous persons and requested information. This was 13 days after the baby had been placed in their custody.

Later in the day she received information by telephone. She called the police department and met Officer Deere and Policewoman Bolin (or Berner) at 702 Cortland, which was about a block from the alley where the baby was found.

The appellant arrived a few minutes later and went into a room with Officer Bolin.

Appellant's oral statement to Police-woman Bolin, admitted without objection, includes the following: "She told us she had had the baby there at the house, and she had the baby on the afternoon of February 29th, she delivered it herself and placed the baby in a box and then put it on the dresser, and that evening about seven o'clock when it got dark she took the baby out of the box and took it outside and placed it on a pile of leaves out by her house in the alley way, and she placed it there because she couldn't take care of the baby and thought somebody would find it. * * * she told me she wrapped the baby up in a blanket."

Appellant's confession, which was voluntarily made and reduced to writing after proper warning, was introduced in evidence without objection and reads, in part:

"I have been divorced from my husband Williams Turner for three years. During our marriage we had three children. * * * On February 29th, 1964 I woke up in the morning and I knew I was in labor. My children got up for the day and I layed on the couch in the living room and they played outside all morning. I was on the couch so that I could watch them and about noon the pains started getting longer and harder and I called the children in the house and gave them some lunch and then I put them to bed and put some toys in bed with them. I got back on the couch and I had the baby by myself. I cut the cord with a pair of scissors and then I wrapped him in a white baby blanket. I think it was around two o'clock when I had him. I put the after birth in some newspaper and then wrapped it in brown garbage sacks and I put it out with the garbage. I cleaned everything up and I put the baby in a box that I had gotten groceries in and I put him on my dresser. I just hoped that the children wouldn't hear him cry or anything. He just slept all day. That evening after it got dark I got the boys interested in watching television and I took the baby in the box as far as my kitchen door and then I picked the baby up and I placed him on a pile of leaves in an alley that was behind where I lived. I thought that somebody would find him, I didn't think he would have to stay there all night. When I put him down I wrapped him up tight in the blanket but I didn't cover his face. I know that I did wrong but I didn't know what else to do. I didn't want to hurt my family and I was afraid that my ex-husband would try to take my children. I didn't want to hurt the baby but I knew I couldn't keep him. I didn't want anybody to know and I thought somebody would find him right away."

Dr. Rankin, Pediatrics Resident Physician who examined the baby, testified:

"A. When the child arrived at the clinic at Ben Taub he was brought in in blankets and the child was quite cold, his skin was quite cold all over, blue and mottled; the child was breathing regularly, and did have a very weak cry and appeared to be suffering primarily from exposure at that time.

"Q. This was a male child, is that correct?

"A. Yes sir.

"Q. White in color?

"A. Yes sir.

"Q. Could you tell approximately how old the child was, if you know?

"A. The child was apparently a new born in that it had this vernix caseosa or oily like material on his skin; his umbilical cord was still attached, it was approximately eight (8) to ten (10) inches long I believe, it had been cut, but was not tied, however there was no evidence of hemorrage; the child did appear to be new born. I would estimate a range from, anywhere from twelve to six (6) hours of age; it appeared to be more than just one hour; I

couldn't give you a specific time, no sir."

 We overrule the appellant's contention that the information is null and void "for the reason that nowhere does it contain the qualifying language that the name of the child 'cannot be ascertained by reasonable diligence' or other language of like import."

Art. 401 C.C.P. provides that when the name of the person necessary to be stated in the indictment is unknown to the grand jury, that fact shall be stated.

When the name of the injured party is unknown, it is sufficient to aver that fact. State v. Snow, 41 Tex. 596; Ranch v. State, 5 Tex.App. 363; Rutherford v. State, 13 Tex.App. 92.

Art. 402 Vernon's Ann.C.C.P. contains a similar provision in regard to allegation of ownership. It provides that where the ownership of property is unknown to the grand jury, it shall be sufficient to allege that fact. Cases are cited under Note 15 holding that an allegation that the owner of the property is to the grand jury unknown is sufficient.

Appellant's remaining claim of error is that "no proof whatsoever was adduced by the state through testimony of witnesses or by documents or otherwise that the name of the child was unknown to affiant (pleader)."

The diligence of Sharon Maher, upon whose affidavit the information was presented, was not put in issue. No evidence was introduced which showed or tended to show that the child had been given a name. In fact, the evidence shows that the advent of the unwanted child into the world was known only to the appellant prior to the time it was found in the alley.

The infant child was less than 12 hours old when it was taken to the alley and deserted.

That Sharon Maher failed to ask the appellant the name of the child shows no lack of diligence. Hicks v. State, 97 Tex. Cr.R. 373, 263 S.W. 291.

The evidence is sufficient to sustain the conviction and no error appears.

The judgment is affirmed.